UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WILLIAM B. BEECHER,<br><br>    Plaintiff,<br><br> v.<br><br>CITY OF TACOMA, et al.,<br><br>    Defendants. | CASE NO. C10-5776 BHS<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendants' motion for summary judgment (Dkt. 23). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants Defendants' motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On October 21, 2010,  Plaintiff William Beecher ("Beecher") filed a complaint against Defendant City of Tacoma ("City").  Dkt. 1.  On October 28, 2010, Beecher filed a complaint against Defendants Russell Martin ("Officer Martin") and Jon Verone ("Officer Verone") (collectively with City, "Defendants").  Case No. 10-5796BHS, Dkt.

1. On April 11, 2011, the Court consolidated the cases under this cause number. Dkt. 13. Based upon the two complaints, Beecher alleges that (1) Officers Martin and Verone used excessive force while arresting Beecher in violation of Beecher's First and Fourteenth Amendment rights, (2) the City is liable for Beecher's injuries because the officers acted pursuant to an official policy or custom, and (3) the City is also liable because it owned the dog that inflicted Beecher's injuries.

On March 15, 2012, Defendants filed a motion for summary judgment. Dkt. 23. On April 2, 2012, Beecher responded. Dkt. 28. On April 4, 2012, Defendants replied. Dkt. 30.

## II.   FACTUAL BACKGROUND

During the dark, early morning hours of October 29, 2007, Tacoma police were dispatched to investigate a suspicious vehicle at a construction site on 6th Avenue in Tacoma, Washington. Dkt. 25, Affidavit of Officer Jon Verone ("Verone Aff."), Exh. 1 ("Arrest Report") at 1-2. Police dispatch also advised the officers that there was a possible theft in progress at the construction site and that the vehicle involved in the theft possibly matched the description of a stolen vehicle. *Id*. The officers' investigation revealed that there was a felony burglary in progress at the construction site. *Id*.

When officers arrived, the three occupants in the suspicious vehicle attempted to flee. Dkt. 24, Affidavit of Jean Homan ("Homan Aff."), Exh. 1, Deposition of William Beecher ("Beecher Dep.") at 8-9. Officers immediately detained one suspect. Arrest Report at 2. However, the other two suspects, including Beecher, fled the scene. Beecher Dep. at 8-9. Upon seeing headlights, Beecher testified that his two friends, the

1   other suspects, opened their doors and "bolt[ed]." *Id.* at 8.  Beecher, who was in the back

2   seat of the vehicle, got out of the vehicle and started running because he figured the

3   police had arrived. *Id.* at 9-10.   As Beecher ran, he heard the police call after him,

4   saying "stop, freeze." *Id.*  At that point, Beecher testified that the "chase was on." *Id.*

5   Beecher intentionally fled from police for the express purpose of evading arrest.  *Id.* at 8.

6          When Officer Verone arrived at the scene, he saw one of the suspects fleeing up a

7   concrete embankment underneath the SR16 overpass on Pearl Street.  Verone Aff., ¶ 4.

8   Officer Verone reported that the suspect "[r]an up the embankment on SR16 towards

9   Pearl" and that the suspect "[s]hould be locked in the general area."  Dkt. 29, Declaration

10  of Jeffrey Boyd ("Boyd Decl."), Exh. 10.  This suspect was Beecher.  Beecher Dep. at 11.

11  After Beecher climbed the embankment, he secreted himself in "a very small triangular

12  space" which was sandy, dirt based, and had little room for more than one person.  *Id.* at

13  12.  Beecher states that he hid himself in that area for about 20 minutes. *Id.* at 14.

14  Beecher maintains that from his position he could not hear what the police were doing in

15  the parking lot below or near the construction site. *Id.* at 13. Beecher also claims he

16  could not see what was going on, unless he went back up to where he was and poked his

17  head down. *Id.*

18         The officers did not know where Beecher was hidden because, as Officer Verone

19  reported, they "quickly lost sight of [Beecher] as he ran between two of the large concrete

20  pillars that support the overpass."  Arrest Report at 2.  Nor did they know whether he was

21  armed, as he had fled the crime scene before police could determine whether he carried

22  any weapons.  Verone Aff., ¶ 6.  Having seen him run up to the top of the embankment,

however, officers claimed Beecher was in a tactically superior position with the ability to

see and ambush police, who were initially situated below him.  *Id.*  Officer Verone

attempted to set up a containment area and called for K9 and Washington State Patrol's

assistance.  *Id.*, ¶ 5; Arrest Report at 2.

     The K9 unit on call that night was Officer Martin and his K9 partner Bo ("K9

Unit").  Dkt. 26, Affidavit of Officer Russell Martin ("Martin Aff."), ¶ 4.  Officer Tim

Fredericks, Tacoma Police Department Master Canine Trainer, personally trained Officer

Martin and his partner Bo, and he has the opportunity to formally evaluate Officer Martin

and Bo on at least a monthly basis. Dkt. 32, Affidavit of Officer Fredericks, ¶¶ 2, 5. He

also reviews Officer Martin's canine report logs twice yearly.  Dkt. 31, Affidavit of Jean

Homan, Exh. 1, Deposition of Officer Fredericks ("Fredericks Dep.") at 5[1].  Officer

Fredericks has never found any performance deficiencies in either Officer Martin or Bo.

Dkt. 32, Affidavit of Officer Fredericks, ¶ 5.  Bo is trained to search for a suspect and,

upon encountering the suspect, "bite onto the suspect and hold until ordered to release by

the handler."  *Id.* ¶ 6.

     Approximately eight minutes after the first officer arrived at the scene, Officer

Martin and Bo arrived.  Arrest Report at 2; Dkt. 26, Affidavit of Officer Russell Martin

("Martin Aff."), ¶¶ 4-5.  Officer Martin was informed "that one of the suspects had run

northbound on Pearl Street and was last seen running towards the overpass embankment .

---

     [1] Even though Defendants submitted this evidence with their reply brief, the Court will
consider the evidence because Beecher failed to object to the untimely submission and he is not
prejudiced by evidence of Bo's training and performance history.

1  . .," and he "confirmed that Tacoma officers had maintained a perimeter around [the] area

2  so as to avoid contaminating the scene . . . ."  *Id.*, ¶ 6.   Officer Martin deployed Bo on a

3  thirty-three-foot lead to begin tracking Beecher.  *Id.* ¶¶ 6, 8.  Officer Verone acted as

4  cover for the K9 Unit, which means he followed them to watch for external threats and to

5  assist in taking the suspect into custody.  Verone Aff., ¶ 5.  When Officer Martin and Bo

6  approached the general area where Beecher was last seen, "Bo immediately picked up the

7  suspect's scent and began to track."  Martin Aff., ¶ 8.  Officer Martin asserts that "Bo's

8  response to the scent was immediate and definite and there was no question that he had

9  located the suspect's scent."  *Id.*

10        Officer Martin recounts the remainder of the search and arrest as follows:

11        Once [Bo] picked up the suspect's scent, K9 Bo immediately began
          trying to climb the steep embankment, but he could not get any traction on
12        the cement, so we circled to the north side of the embankment where the
          slope is not paved. K9 Bo immediately began working his way up the grass
13        embankment. When he reached the top of the grass embankment, he turned
          to the south and worked his way under the westbound overpass and then
14        turned up a shorter dirt embankment to the triangular area between the
          westbound and eastbound lanes.
15        As soon as K9 Bo made it to the top of the embankment, I heard the
          suspect start yelling. I made my way up the embankment, which was very
16        steep and made of soft dirt, so it was extremely difficult for me to climb
          and maintain traction. I had to essentially use K9 Bo for support to maintain
17        my position and was almost lying on the dog's back.
          When I got the top of the embankment, I saw that Beecher was lying
18        on his back in the small triangular area between the east and west bound
          lanes of SR 16. K9 Bo had made contact with Beecher's left leg. Beecher
19        had his left hand on K9 Bo's head and was kicking K9 Bo with his right
          foot. I could not see Beecher's right hand and did not know if Beecher was
20        armed. I ordered Beecher to show me his hands, which he did, but Beecher
          continued kicking K9 Bo around the head area with his right foot. As
21        Beecher was kicking at K9 Bo's head, because of where I was positioned in
          relation to the dog, he was also kicking directly towards my face.
22

ORDER - 5

1

I repeatedly ordered Beecher to stop kicking the dog and to stop moving, but Beecher failed to comply with my orders. As a K9 handler, I am trained not to recall the dog until the suspect is compliant and under control. The dog is also trained to maintain its hold on a suspect until the suspect stops resisting and stops all assaultive behavior. This is for officer safety reasons. Beecher continued to kick at K9 Bo and started rolling from side to side.

2

3

4

Officer Verone was finally able to get up the embankment past me and got Beecher over onto his stomach and into handcuffs. Even after Beecher was handcuffed, he continued to move around and kick at K9 Bo's head. Because I was still on the steep embankment, Beecher's kicking was getting closer to my head and face. I then struck Beecher's right leg twice with my small flashlight and again ordered him to stop kicking. Beecher finally stopped kicking long enough for me to get the rest of the way up the embankment and recall K9 Bo. K9 Bo did release his hold on Beecher when commanded to do so.

5

6

7

8

9

Martin Aff., ¶¶ 10-14.

10

Officer Verone recounts a similar experience:

11

12

I followed Officer Martin (the K9 handler) and his dog up to the nook between the eastbound and westbound lanes of SR 16, at the top of the embankment. This is where the suspect, later identified as William Beecher, had hidden himself. This "nook" is at the top of the embankment and cannot be seen from either SR 16 or Pearl Street. Additionally, we could not see Mr. Beecher in this nook until we crested the embankment. This space provided Mr. Beecher with a tactical advantage that placed my safety and Officer Martin's safety at heightened risk, as Beecher would have been able to see us coming, but we could not see him as we approached. Additionally, we did not know whether Mr. Beecher was armed, but we did know that other officers had developed probable cause to arrest Mr. Beecher for felony burglary.

13

14

15

16

17

The K9 made contact with Mr. Beecher and Mr. Beecher was repeatedly told to "show us your hands." At that point, Mr. Beecher started flailing his legs and kicking the dog. I saw Mr. Beecher kick the K9 several times. Because of Officer Martin's position, Officer Martin was also at risk of being kicked or struck by Beecher.

18

19

I gave Mr. Beecher repeated commands to get on his stomach, but Mr. Beecher was very slow to comply. Mr. Beecher finally rolled over onto his stomach, but then he slipped his right arm under his body. At this point, we still did not know whether Beecher was armed and did not know if he was trying to reach for a weapon or trying to conceal evidence. I was able

20

21

22

1  to eventually pull Mr. Beecher's arm out from under his body and get him
   into handcuffs. Even after I got Mr. Beecher into the handcuffs, Beecher
2  continued to kick at the dog, and again, because of Officer Martin's
   position, Officer Martin was also at risk of being kicked or struck by
3  Beecher.
        Immediately after arrest, medical aid was requested for Mr. Beecher.
4  Because of the steepness of the embankment, it was not safe to move Mr.
   Beecher down the hill. Instead, we moved him up onto SR 16, where
5  medical aid responded and treated Mr. Beecher.

6  Verone Aff., ¶¶ 6-9.

7       Beecher provides a different account of the incident.  Beecher admits that he ran

8  from the officers and hid in the small triangular area.  Beecher Dep. at 12.  He states that

9  he "had the option to run from there," but "was scared and [he] decided to stay there."

10 *Id*.  He recounts first seeing Bo as follows:

11        I became aware that the police dog was there when I was trying to
   catch my breath and I was still just, you know, not sure what was going on.
12        The dog seemed to run by me. He stopped and continued past me to my
   left, and 3 seconds go by and he's back on me. I thought he had passed me,
13        that maybe he had sniffed me but he missed me, but then he came back
   within like 5 seconds after that.

14
   *Id*. at 14-15.  Beecher recognized the dog as a "police dog" and then was bit two or three
15
   seconds later.  *Id*. at 16.  Beecher contends he was thrown about, as the dog pulled him
16
   towards the embankment and "suck[ed]" on his leg.  *Id*. at 17.  He recalls screaming in
17
   pain and feeling like his leg was "getting ripped off."  *Id*. at 18.   In contrast to the
18
   officers' recollection, Beecher states that during the entire attack, he never even touched
19
   the dog; he only grabbed his own thigh.  *Id*.
20
21      With regard to the amount of time that passed between Bo's initial bite and the

22 arrival of the officers, Beecher provides inconsistent testimony.  When asked if he knew

1  whether the cops had found him, he responded that the "dog was there a little bit before

2  they got there but, yes, I was aware that was a police dog." *Id.* at 16.  Beecher then

3  testified that, after Bo made contact, it "was a good 2 minutes before the first police

4  officer arrived." *Id.* at 18.

5       Once the officers did arrive, Beecher claims that he was entirely compliant; he had

6  not disobeyed any order of a police officer.  *See* Homan Aff., Exh. 2 at 20 (Plaintiff's

7  Responses to Defendant's First Discovery Requests).   Beecher's first recollection of the

8  officer was being asked whether he had any weapons and then the officer "lunged" at

9  him.  Boyd Decl., Exh. 8, Deposition of William Beecher at 55-56 (deposition

10  pagination).  Then, Beecher remembers as follows:

11          The dog was biting me and then the police officer appeared. He said,
         "Do you have any weapons on you?" I said, "No," and he started searching
12        me. I remember him diving on top of me while the dog was still biting me.
         After he searched me and there were no weapons, I remember hearing, "Get
13        the bad man. Get the bad man." Then I believe another officer had shown
         up, the second one on the scene, and at that point I was just waiting for
14        them to get him off of me.

15  *Id.* at 57.  Beecher asserts that he was sitting down with his "back to the back of the

16  overpass [while] getting searched." *Id.* at 60.  Beecher does not remember being rolled

17  onto his stomach or being placed in handcuffs.

18       Beecher does not dispute that an officer instructed Bo to release his hold on

19  Beecher's leg.  Beecher, however, contends that:

20          [A]t that point [other officers] all converged and they were trying to get the dog to
         let go of my leg and the dog was not responding. It seemed like when they finally
21        got the dog's jaws open there was the handler and two other cops pull the dog

22

towards Pearl Street. I'm still facing the same way, and finally with three of them trying to wrench his jaws open they got him off me. [2]

Dkt. 28 at 8, Dkt 29-1 at 117 and Dkt 24-2 at 16.

It is undisputed Beecher sustained injuries as a result of the arrest.  Dkt. 23 at 9. According to Beecher, he has continuing pain in his leg, disfigurement, permanent scarring, partial loss of use, and psychological trauma from being mauled by the dog. Homan Aff., Exh. 4.  He also has pain in his left leg nearly every day, scarring where the bite was, loss of strength and function in his leg, low back pain, and walks with a limp most of the time.  *Id.*

### III.    DISCUSSION

Defendants have moved for summary judgment on the following grounds: (1) excessive force was not used so all claims should be dismissed; (2) Beecher cannot establish an essential element of § 1983 claim against the City; (3) the doctrine of qualified immunity renders individual officers immune from § 1983 suits; and (4) Beecher's strict liability claim under RCW 16.08.040 should be dismissed because the City did not own Bo and the use of force was reasonable.

### A.    Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

---

[2] Beecher failed to submit page 62 of his deposition.  In his response, Beecher cites page 62 as containing the last four lines of this statement. Dkt. 28 at 8. The Court also finds a substantially similar statement of facts in Beecher's Responses to Defendants' First Discovery Requests.  Dkt. 24-2 at 16.  Thus, the Court includes the statement as cited in Beecher's response even though the entire quote is not in the record as admissible evidence.

1   fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

2   The moving party is entitled to judgment as a matter of law when the nonmoving party

3   fails to make a sufficient showing on an essential element of a claim in the case on which

4   the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

5   323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

6   could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

7   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

8   present specific, significant probative evidence, not simply "some metaphysical doubt").

9   *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

10   if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

11   jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

12   U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

13   626, 630 (9th Cir. 1987).

14          The determination of the existence of a material fact is often a close question. The

15   Court must consider the substantive evidentiary burden that the nonmoving party must

16   meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

17   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

18   issues of controversy in favor of the nonmoving party only when the facts specifically

19   attested by that party contradict facts specifically attested by the moving party.  The

20   nonmoving party may not merely state that it will discredit the moving party's evidence

21   at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

22   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

1   nonspecific statements in affidavits are not sufficient, and missing facts will not be

2   presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

3   **B.      42 U.S.C. § 1983**

4          Section 1983 is a procedural device for enforcing constitutional provisions and

5   federal statutes; the section does not create or afford substantive rights. *Crumpton v.*

6   *Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). In order to state a claim under 42 U.S.C. §

7   1983, a plaintiff must demonstrate that (l) the conduct complained of was committed by a

8   person acting under color of state law and that (2) the conduct deprived a person of a

9   right, privilege, or immunity secured by the Constitution or by the laws of the United

10  States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by*

11  *Daniels v. Williams*, 474 U.S. 327 (1986).

12         In this case, Beecher claims that Officers Verone and Martin violated his Fourth

13  and Fourteenth Amendment rights.

14         **1.      Fourth Amendment**

15         The Fourth Amendment guarantees the right of the people to be secure in their

16  persons, houses, papers, and effects, against unreasonable searches and seizures. U.S.

17  Constitution, Amend. VI.   Beecher alleges a violation of his Fourth Amendment rights

18  based on the use of unreasonable and excessive force. Dkt. 1, ¶¶ 4.1-4.4.

19         It is well established that Fourth Amendment excessive force claims are properly

20  analyzed under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S.

21  386, 394 (1989). In other words, law enforcement officers making an arrest may use

22  only that amount of force that is objectively reasonable in light of the facts and

circumstances confronting the officer, without regard to the officer's underlying intent or motivation. *Id.* at 397.

In analyzing an excessive force claim, the court must first examine the quantum of force used against the individual. *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). Next, the court must assess the importance of the governmental interests involved. *Id.* Finally, the court must "consider the dispositive question whether the force that was applied was reasonably necessary under the circumstances." *Miller v. Clark County*, 340 F.3d 959, 966 (9th Cir. 2003).

### a. Intrusion on Constitutional Rights

A court "assesses the gravity of the intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Id.* at 964. In the instant case, the Defendants neither dispute that the force applied by Bo was significant, nor that Beecher sustained injuries as a result of the encounter. In fact, according to Beecher's uncontroverted allegations, he suffered severe injuries to his left leg, experienced intense pain at the time of the attack, was hospitalized twice following the encounter, and received treatment for the wound for the next three months. Dkts. 28 at 9 & 29-1 at 43, 44 (photographs of injuries). Moreover, Beecher claims that he has continuing pain in his leg, disfigurement, permanent scarring, partial loss of use, and psychological trauma from this incident. *Id.* Therefore, the Court concludes that the intrusion on Beecher's Fourth Amendment interests was significant.

1        **b.      Assessing the Government Interests**

2        Next, the Court must assess the importance and legitimacy of the government's

3   countervailing interests.  The three factors pertinent to this inquiry are:

4        (1) the severity of the crime the suspect is believed to have committed;
         (2) whether the suspect poses an immediate threat to the safety of
5        officers or others; and (3) whether he is actively resisting arrest or
         attempting to evade arrest by flight.
6
7   *Chew*, 27 F.3d at 1440 (citing *Graham*, 490 U.S. at 396).   Additionally, the Ninth

8   Circuit has held that whether a warning was given before the use of force is a factor that

9   may be considered in applying the *Graham* balancing test.  *Deorle v. Rutherford*, 272

10  F.3d 1272, 1283–84 (9th Cir. 2001).

11       **i.      Severity of the Crime**

12       "The character of the offense is often an important consideration in determining

13  whether the use of force was justified."  *Deorle*, 272 F.3d at 1280.  In the instant matter,

14  the officers believed they had probable cause to arrest Beecher for burglary and/or

15  possession of a stolen vehicle.  Verone Decl., Exh. 1.  In Washington, burglary is

16  classified as a felony.  *See* RCW 9A.52.030.  Under these circumstances, "[t]he

17  government has an undeniable legitimate interest in apprehending criminal suspects . .

18  . and that interest is even stronger when the criminal is . . . suspected of a felony."

19  *Miller*, 340 F.3d at 964.  The Ninth Circuit, however, has also cautioned that a "wide

20  variety of crimes, many of them nonviolent, are classified as felonies."  *Chew*, 27 F.3d

21  at 1442.  In *Chew*, the court found that a suspect wanted for burglary weighed in favor

22

1  of the government "only slightly." *Id.*  Therefore, the Court finds that the seriousness

2  of Beecher's suspected crime weighs slightly in favor of the government.

3           **ii.      The Threat to the Safety of the Officers & Public**

4           "[T]he most important single element of the three specified factors [is] whether the

5  suspect poses an immediate threat to the safety of the officers or others." *Chew*, 27 F.3d

6  at 1441.

7           *Chew* and *Miller* provide factual situations that sit at opposite ends of a spectrum

8  upon which the facts of this case lie.  In *Chew*, the court summarized the relevant facts

9  and concluded as follows:

10          Chew was initially stopped for a traffic violation. Before he fled, he
            was asked for his driver's license, and produced it. He also retrieved
11          cigarettes and a lighter from his car, lit a cigarette, and engaged in a certain
            amount of conversation with the officer before his flight. Apparently,
12          nothing about Chew's appearance or demeanor gave the officer reason to
            believe he should search the suspect. It appears from the record that after
13          fleeing Chew hid in the scrapyard for an hour and a half before [Officer]
            Bunch released [KP] Volker in an effort to capture him. The defendants do
14          not suggest that Chew engaged in any threatening behavior during this
            time, or that he did anything other than hide quietly. In light of these facts,
15          a rational jury could easily find that Chew posed no *immediate* safety threat
            to anyone.
16
   *Chew*, 27 F.3d at 1442 (emphasis in original).
17
            In *Miller*, the suspect was "wanted by police for the felony of attempting to flee
18
   from police by driving a car with a wanton or willful disregard for the lives of others."
19
   *Miller*, 340 F.3d at 960.  Before the officer approached the house he was dispatched to,
20
   he was informed that the "house's residents were not 'law enforcement friendly' and that
21
   a '10–96,' a mentally ill person, lived there." *Id*. at 960.  The officer looked into the car
22

1    the suspect was allegedly driving and "saw a seven or eight-inch knife . . . ." *Id.* The

2    suspect fled across his property into "some dense, dark, wooded terrain." *Id.* at 960–961.

3    The court determined that, "[g]iven the gravity of the risk to law enforcement, with [the

4    suspect] hiding in the shadows, this second *Graham* factor weighs heavily in the

5    government's favor." *Id.* at 965.

6           In this case, Beecher created a safety threat for the officers.  Unlike the officers in

7    *Chew*, neither Officer Verone nor Martin had contact with Beecher before he fled, and

8    they had no opportunity to evaluate his appearance and/or demeanor.  Moreover, neither

9    officer knew whether Beecher was armed.  Similar to the officer in *Miller*, the officers

10   were following an unknown suspect at night into a dark, elevated and obstructed area,

11   and the officers were approaching from a tactically inferior position.  Therefore, the

12   Court finds that Officers Verone and Martin faced objective concerns for their safety.

13          With regard to the issue of whether Beecher was confined to a particular area,

14   Beecher argues that the facts of this case are similar to the facts of *Chew*.  However, the

15   facts of that case present a completely different scenario:

16               Chew was trapped in the scrapyard for two uneventful hours before
                 Volker bit and mauled him. There was time for deliberation and
17               consultation with superiors. There was even time for the police to summon
                 a helicopter to the scene, an airborne vehicle which apparently aided the
18               dogs in their search.

19   *Chew*, 27 F.3d at 1443.  Although Officer Verone stated that Beecher "should" be

20   confined to a particular area, there are no objective facts in the record that the officers

21   knew for sure that Beecher was surrounded or confined to a certain location with no

22   escape route.  In fact, Beecher even testified that he could have continued to flee from his

1  hiding area, but decided to stay because he was scared.  The Court also notes that the

2  third suspect evaded the officers that night, and Beecher may have as well if Officers

3  Martin and Verone decided to track Beecher into the shadows under the overpass.

4  Therefore, from a reasonable officer's perspective, the situation confronting Officers

5  Martin and Verone presented significant safety concerns, and this factor weighs in favor

6  of the government.

7                    **iii.      Resisting or Evading Arrest by Flight**

8          The third factor under *Graham* is whether the suspect actively resisted arrest or

9  attempted to evade arrest by flight.  In this case, Beecher concedes that he was evading

10 arrest.  He states that he fled the car once he knew the approaching cars were police

11 vehicles, he heard the police yell "stop, police," and he considered "the chase [to be] on."

12 Beecher Dep. at 8.  Therefore, this factor unequivocally favors the government.

13                    **iv.      Lack of Warning**

14         "[T]he giving of a warning or failure to do so is a factor to be considered in

15 applying the *Graham* balancing test."  *Doerle*, 272 F.3d at 1284.  "[W]arnings should be

16 given, when feasible, if the use of force may result in serious injury . . . ."  *Id*. at 1284.

17         In this case, it is undisputed that a warning was not given and the issue is whether

18 it was "feasible" to give one.  Beecher relies heavily on the absence of a warning as well

19 as procedures developed when an officer uses a dog to find a suspect in a building.  Dkt.

20 28 at 17-19.  First, Beecher's reliance on procedures for searching a building is

21 inapplicable to the situation created by Beecher.  The officers did not know where

22 Beecher was located or whether he was confined to an area, such as a confined and

1 completely surrounded scrapyard.  Moreover, Officer Fredricks testified that there exists

2 heightened safety risks when searching for a suspect in an open area:

3      We don't know if he's ahead of us or behind us or in front of us. We
       don't have him anywhere confined to a specific area so officer safety is
4      highly compromised to be giving warnings out on the street.

5 Dkt. 29-1 at 64.  Therefore, the Court finds that Beecher's reliance on procedures

6 designed for searching confined areas is without merit.

7      With regard to whether it was feasible to give a warning, the officers did not know

8 whether or when they were approaching Beecher's location.  Officer Martin kept Bo on a

9 lead and within close proximity throughout the search.  Thirty-three feet is sufficient

10 distance to communicate with Beecher if there was an opportunity to do so.  However,

11 there are no facts in the record that Officer Martin knew that Beecher was within Bo's

12 range in order for Officer Martin to warn Beecher and/or give Beecher an opportunity to

13 surrender without the use of force.  To the contrary, only when Officer Martin was

14 climbing the steep embankment did he hear Beecher yell.  Even if the officers had known

15 Beecher's exact location, issuance of a verbal warning could have created a heightened

16 safety risk for the officers because a potentially armed felony suspect was positioned

17 above them, in a tactically superior position.  Therefore, from an objective standpoint, the

18 fact that Officer Martin did not issue a warning does not weigh against the government.

19      **c.      Weighing the Conflicting Interests**

20      The Court must now consider the "dispositive question of whether the force that

21 was applied was reasonably necessary under the circumstances." *Miller*, 340 F.3d at 966.

22

1    Under the circumstances known to Officer Martin, use of the police dog was well

2    suited to search for and detain Beecher.  There is no doubt that Bo was a significant

3    intrusion on Beecher's constitutional rights.  However, each *Graham* factor analyzed

4    above weighed either in favor or slightly in favor of the government.  From an objective

5    standpoint, the use of a canine on a lead to search for and detain a suspected felon, who is

6    admittedly evading police and hiding in a dark, tactically superior position, is not

7    unreasonable.  Therefore, the Court concludes that the government's interest in deploying

8    Bo outweighs Beecher's interests, and the use of Bo was reasonable under the

9    circumstances.  These conclusions, however, do not end the analysis because Beecher

10   presents facts that he argues could turn an otherwise lawful use of force into a

11   constitutional violation.

12   "[E]xcessive duration of [a] bite and improper encouragement of a continuation of

13   [a canine] attack by officers could constitute excessive force that would be a

14   constitutional violation."  *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1093 (9th Cir.

15   1998).  First, Beecher asserts that, after an officer searched him and determined he did

16   not have a weapon, the officer instructed Bo to "Get the bad man. Get the bad man."

17   Beecher Dep. at 57.  With regard to the content of the statement, the subjective intent of

18   an officer is beyond the scope of an excessive force analysis.  In fact, "good intentions

19   will not redeem an otherwise unreasonable use of force, nor will evil intentions transform

20   an objectively reasonable use of force into a constitutional violation."  *Chew,* 27 F.3d

21   1440 (*citing Graham*, 490 U.S. at 397).

22

1    With regard to the alleged timing of the statement, Beecher fails to present any

2 facts that show the statement encouraged an improper continuation of the use of force.

3 Beecher states that he was searched while sitting with his back to the overpass.  After

4 that, Beecher does not remember being handcuffed or rolled over on his stomach.  Even

5 though Beecher argues that he "was on his stomach, in handcuffs, [and] the dog

6 continued to maul him," missing facts will not be presumed.  *Lujan*, 497 U.S. at 889.

7 Although Beecher does not remember relevant aspects of the encounter, his arguments

8 imply a situation in which the officers passively stood by and allowed Bo to inflict

9 damage on an entirely compliant suspect after the officers searched the suspect for

10 weapons.  However, Beecher's "version of the incident cannot control on summary

11 judgment when the record as a whole does not support that version."  *Wilkinson v.*

12 *Torres*, 610 F.3d 546, 551 (9th Cir. 2010); *see also Scott v. Harris*, 550 U.S. 372, 378–79

13 ("Indeed, reading the lower court's opinion, one gets the impression that respondent,

14 rather than fleeing from police, was attempting to pass his driving test . . . .").  Both

15 officers state that, once they encountered Beecher, they searched him, rolled him over on

16 his stomach, handcuffed him, and then Officer Martin ordered Bo to release his grip.

17 There are no facts in the record to contradict this evidence.  Therefore, Beecher has failed

18 to show that a material question of fact exists on the issue of whether the officers used Bo

19 improperly.

20    Second, Beecher argues that he experienced an excessive duration of force

21 because Bo did not release upon command.  This, however, is not excessive duration of a

22 bite that would convert an otherwise lawful use of force into a constitutional violation.

1   Even Beecher concedes that the officers immediately reacted to remove Bo from

2   Beecher's leg and reduce the harm to Beecher.  Moreover, Bo had no history of

3   performance deficiencies.  At the time when Officer Martin deployed Bo, it was

4   reasonable to assume that Bo would release upon command.  Therefore, the use of Bo

5   was reasonable under the circumstances and the officers only used Bo to the extent

6   necessary to effect Beecher's "arrest as safely as possible under the circumstances."

7   *Miller*, 340 F.3d at 967.  Based on this conclusion, the Court grants summary judgment in

8   favor of Defendants on Beecher's claim for a violation of his Fourth Amendment rights.

9       **1.     Fourteenth Amendment**

10      Beecher's Fourteenth Amendment substantive due process claim is based on the

11   same operative facts that Beecher challenges through his Fourth Amendment claims.[3]

12   Thus, Beecher's claims fall "squarely within the scope of the Fourth Amendment," and

13   they must be analyzed according to its principles, and not under the generalized notion of

14   Fourteenth Amendment substantive due process.  *See County of Sacramento v. Lewis,*

15   523 U.S. 833, 843 (1998) (substantive due process analysis is appropriate in cases not

16   covered by the Fourth Amendment) (*citing U.S. v. Lanier*, 520 U.S. 259, 272 (1997))

17   (*Graham* requires that constitutional claim covered by a specific constitutional provision,

18   such as the Fourth or Eighth Amendment, must be analyzed under the standard

19   appropriate to that specific provision, not under the rubric of substantive due process).

20   _____

21       [3] Notably, Beecher fails to adequately brief how his Fourteenth Amendment substantive

22   due process claim is applicable to the specifics of his case, citing neither relevant Fourteenth
     Amendment case law nor applying substantive legal analysis supporting such a claim.

1   Therefore, the Court grants Defendants' motion for summary judgment on Beecher's

2   Fourteenth Amendment claim.

3   **C.      *Monell* Liability and RCW 16.08.040**

4          Because the Court concludes that Beecher's constitutional rights were not

5   violated, the Court need not address whether the City is liable under *Monell*.  *Miller*, 340

6   F.3d at 968 n. 14.

7          With regard to Beecher's claim under RCW 16.08.040, the Court dismisses this

8   claim because the Court concludes that the use of force was reasonable.  *Id.*

9                              **IV.     ORDER**

10         Therefore, it is hereby **ORDERED** that Defendants' Motion for Summary

11  Judgment (Dkt. 23) is **GRANTED** on all of Beecher's claims.  The Clerk is directed to

12  enter judgment for Defendants.

13         Dated this 23rd day of May, 2012.

14

15

16                                      BENJAMIN H. SETTLE
                                        United States District Judge

17

18

19

20

21

22

ORDER - 21